**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| TSIC, Inc., f/k/a The Sharper Image Corporation, | ) | Case No. 08-10322 (KG) |
| | ) | |
| Debtor | ) | |
| | ) | |
| TSIC, Inc., f/k/a The Sharper Image Corporation, | ) | |
| | ) | |
| Plaintiff | ) | |
| v. | ) | |
| | ) | Adversary No.: 08-51902 (KG) |
| Richard Thalheimer, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF
DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT**

Garvan F. McDaniel (#4167)
BIFFERATO GENTILOTTI LLC
800 N. King Street, Plaza Level
Wilmington, DE 19801
Telephone: 302-429-1900

-and-

Michael St. James (Admitted *Pro Hac Vice*)
ST. JAMES LAW, P.C.
155 Montgomery St., Suite 1004
San Francisco, CA 94104
Telephone: 415-391-7566

*Attorneys for Richard Thalheimer*

Dated: November 18, 2009
          Wilmington, Delaware

*Table of Contents*

Table of Authorities ........................................................................................................ii

I.      Nature and Status of the Adversary Proceeding ........................................................1

II.     Summary of the Argument.........................................................................................1

III.    Facts ........................................................................................................................3

IV.     Defendant's Cross-Motion For Summary Judgment Should Be Granted  ...............6

        A.      The Applicable Legal Test.............................................................................6

        B.      The Payment Of Antecedent Debt Is Reasonably Equivalent Value.............7

        C.      The Antecedent Debt Was Incurred in 2002.................................................11

        D.      The 2002 Employment Agreement Is Not Avoidable ...................................13

        E.      Conclusion Regarding Reasonably Equivalent Value ...................................15

V.      Plaintiff's Motion For Summary Judgment Must Be Denied.....................................15

        A.      Plaintiff's Contentions .................................................................................15

        B.      The Transfer Was Not Made To An Insider ..................................................16

                1.      Mr. Thalheimer Was Not A Statutory Insider...................................16

                2.      Mr. Thalheimer Was Not A Non-Statutory Insider...........................17

                3.      Conclusion Regarding Insider Status ................................................19

        C.      There Are Triable Issues Of Fact Respecting The Ordinary Course
                Of Business ..................................................................................................20

VI.     Conclusion ...............................................................................................................22

*Table of Authorities*

## CASES

Advanced Telecommunication Network, Inc.  321 B.R. 308, 329 -330  (Bkrtcy. M.D. Fla., 2005); rev'd on other grounds, 490 F.3d 1325 (11th Cir. 2007). ................................. 7

Atlas Corp. v. DeVilliers  447 F.2d 799, 804 (10th Cir. 1971) ..................................... 9

Barber v. Golden Seed Co., Inc., 129 F.3d 382, 387 (7th Cir.1997) ............................... 7

Commodity Futures Trading Commission v. Probber Intern. Equities Corp.  504 F.Supp. 1154, 1163 (D.C.N.Y., 1981) .............................................................................................. 9

Energy Coop., Inc. v. SOCAP Int'l, Ltd. (In re Energy Coop., Inc.), 832 F.2d 997, 1001 (7th Cir.1987).................................................................................................................. 12

Erie Marine Enter. v. Algoma Central Marine (In re Erie Marine Enter., Inc.), 213 B.R. 799, 803 (Bankr. W.D.Pa 1997 ............................................................................................... 9

Gosch v. Burns ( In re Finn), 909 F.2d 903, 907 (6th Cir.1990.................................... 20

Hersh v. Levinson Bros., Inc., supra, 117 N.J.Eq. at 133, 171 A. 736 .......................... 8

Hovis v. Stambaugh Aviation, Inc. ( In re Air South Airlines), 247 B.R. 165, 171-72 (Bankr.D.S.C.2000);................................................................................................... 20

In re All Media Properties, Inc., 5 B.R. 126 (Bankr. S.D.Tex. 1980), aff'd, 646 F.2d 193 (5th Cir. (Unit A) 1981) (per curiam) .......................................................................... 11, 12

In re All-Type Printing, Inc.  274 B.R. 316 (Bkrtcy. D.Conn., 2002) ...................... 8, 13

In re Bernard Technologies, Inc., 298 B.R. 526 (Bkrtcy. D. Del. 2008) ...................... 21

In re Churchill Mortg. Inv. Corp.  256 B.R. 664, 679 -680 (Bkrtcy. S.D.N.Y., 2000).................. 9

In re CVEO Corp.  320 B.R. 258, 263 - 264  (Bkrtcy. D.Del., 2005) ......................... 21

In re Dill, 30 B.R. 546 (Bankr. 9th Cir.1983) ............................................................ 11

In re Finn,  909 F.2d 903, 908 (6th Cir. ,1990)........................................................... 20

In re First Commercial Management Group, Inc.  279 B.R. 230, 239 (Bkrtcy. N.D.Ill., 2002)..... 9

In re Forman Enterprises, Inc.  293 B.R. 848, 857 (Bkrtcy.W.D.Pa.,2003 ................. 20

In re Fritze LLC  2009 WL 3245499, 7 (Bkrtcy. D.N.J., 2009) ................................... 9

In re Jodoin  208 B.R. 6, 10 (Bkrtcy. D.N.H., 1997)................................................... 9

In re Luis Elec. Contracting Corp.  149 B.R. 751 (Bkrtcy. E.D.N.Y., 1992) ................................. 8

In re Nirvana Restaurant Inc.  337 B.R. 495 (Bkrtcy. S.D.N.Y., 2006) ................................... 8, 13

In re Oakwood Homes Corp.  389 B.R. 357, 366 (D.Del. 2008)................................................... 18

In re O'Day Corp.  126 B.R. 370, 409 (Bkrtcy. D.Mass., 1991)................................................... 8

In re Perry County Foods, Inc., 313 B.R. 875, 895 (Bankr. N.D.Ala. 2004) ( citing Butler
    Aviation Intern'l, Inc. v. Whyte ( Matter of Fairchild Aircraft Corp.), 6 F.3d 1119, 1125-26
    (5th Cir.1993) .......................................................................................................................... 7

In re Pittsburgh Cut Flower Company, Inc., 124 B.R. 451 (Bankr. W.D. Pa. 1991) ................... 19

In re Radio-Keith-Orpheum Corp., 106 F.2d 22, 26-27 (2d Cir.1939)........................................ 13

In re Remington Rand Corp.  836 F.2d 825 (3rd Cir. 1988)......................................................... 13

In re Sharp Intern. Corp.  403 F.3d 43, 53 -54 (2nd Cir. 2005)..................................................... 9

In re THC Financial Corp., 686 F.2d 799, 802-04 (9th Cir.1982)................................................ 12

In re Viscount Air Services, Inc., 232 B.R. 416 (Bankr.D.Ariz.1998)........................................... 7

In re Winstar Communications, Inc.  348 B.R. 234, 279 (Bankr.D.Del. 2005)........................... 18

Johnson v. Lentini, 66 N.J.Super. 398  169 A.2d 208 (Ch.1961).................................................. 8

Marshack v. Wells Fargo Bank ( In re Walters), 163 B.R. 575, 581 (Bankr.C.D.Cal.1994) ......... 8

Matter of M. Frenville Co., Inc.  744 F.2d 332 (3rd Cir. 1984) ....................................... 11, 12, 13

Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L.,
    Inc.), 92 F.3d 139 (3d Cir. 1996).......................................................................................... 7

Mills v. Everest Reinsurance Co.  623 F. Supp. 2d 447, 452 -454 (S.D.N.Y.  2009) .................. 14

Official Comm. of Unsecured Creditors v. Conceria Sabrina S.P.A. ( In re R.M.L., Inc.), 195
    B.R. 602, 618 (Bankr.M.D.Pa.1996) ..................................................................................... 8

Pension Transfer Corp. v. Beneficiaries Under the Third Amendment to Fruehauf Trailer Corp.
    Retire Plan No. 3 (In re Fruehauf Trailer Corporation), 444 F.3d 203 (3d Cir. 2006)................ 6

Remes v. ASC Meat Imports, Ltd. (In re Morren Meat & Poultry Co.), 92 B.R. 737, 740
    (W.D.Mich.1988). ............................................................................................................... 20

Riverside Trust Co. v. Dietrich, 112 N.J.Eq. 43, 163 A. 275 (1932)............................................. 8

Telefest, Inc. v. VU-TV, Inc.  591 F.Supp. 1368, 1377 (D.C.N.J., 1984)...................................... 8

Tomlins v. BRW Paper Co. ( In re Tulsa Litho Co.), 229 B.R. 806, 808 (10th Cir. BAP 1999) . 20

**OTHER AUTHORITIES**

151 Cong. Rec. S1979-01, at S1995 (Cong. Rec. Mar. 3, 2005)................................................... 9

## I.     NATURE AND STATUS OF THE CASE

On February 19, 2008, The Sharper Image Corporation, now known as TSIC ("TSIC" and/or the "Debtor") commenced a voluntary case under chapter 11 of the Bankruptcy Code.  It terminated business operations and liquidated most of its physical assets.  Upon information and belief TSIC is presently administratively insolvent.

On December 31, 2008, TSIC filed a complaint commencing the instant adversary proceeding, seeking to recover the payment of severance and related amounts aggregating $6,055,000 (the "Severance Payment") to Richard Thalheimer (hereinafter referred to as "Mr. "Thalheimer and/or "Defendant"), the Debtor's founder and former Chief Executive Officer, on the grounds that it was avoidable as a constructively fraudulent transfer (the "Complaint").  On February 3, 2009, Mr. Thalheimer filed an Answer, generally denying the averments of the Complaint.

Discovery has closed.  The parties submitted a revised agreed scheduling order, which was entered by the Court, pursuant to which cross-motions for summary judgment would be briefed and the matter would be set for a continued pre-trial conference on February 9, 2010 (the "Revised Scheduling Order").

## II.     SUMMARY OF THE ARGUMENT

1.     Through this adversary proceeding, TSIC seeks to avoid as a constructively fraudulent transfer a pre-petition Severance Payment made by the Debtor to its founder after he was fired without cause.  At the time the Severance Payment was made, the Debtor was abundantly solvent and enjoyed a net equity of more than $167 million.  Contrary to the "sweetheart deal" characterization employed in TSIC's moving papers, there was bitter enmity between the Debtor and the Defendant at the time the

Severance Payment was made, and the Debtor would have refused to pay if there was any legal basis on which it could do so.  Notwithstanding that enmity, the Debtor recognized that it could not evade its contractual obligation to pay severance under the Defendant's Employment Agreement, which, even then, was old, cold and unavoidable.

2.      It is for that reason that the Defendant's cross-motion for summary judgment must be granted:  the payment at issue was made on account of an antecedent debt, and antecedent debts constitute "value" for fraudulent transfer purposes. Moreover, since the payment was equal to the amount of the antecedent debt discharged, the debt discharged clearly constituted "reasonably equivalent value."  Since a transfer for less than reasonably equivalent value is an essential element of every claim for relief the Debtor asserts in this Adversary Proceeding, the Adversary Proceeding must be dismissed.

3.      TSIC's Motion for Summary Judgment must be denied because Mr. Thalheimer was neither a statutory insider nor a non-statutory insider when the Severance Payment was made, and insider status is an essential element of TSIC's case. At the very least, it represents a disputed issue of material fact about which summary judgment is inappropriate.

4.      TSIC's Motion for Summary Judgment must also be denied because the Severance Payment was made in the ordinary course of business.  The Debtor was then abundantly solvent and, having concluded that the obligation to pay severance was a valid debt then due, the Debtor paid it.  Paying debts as they came due was the ordinary course of business for the Debtor. At the very least, whether the payment was made in

the ordinary course of business represents a disputed issue of material fact about which summary judgment is inappropriate.

## III.    FACTS

Richard Thalheimer founded The Sharper Image in 1977. Through his leadership the company grew and prospered, ultimately engaging in an initial public offering and becoming a publicly traded company. Thalheimer Dec., ¶2.

In 2002, after Mr. Thalheimer's ownership dropped below 50%, he required an express employment agreement with The Sharper Image. The Sharper Image Board of Directors (the "Board") established a sub-committee to negotiate the terms of an employment agreement with Mr. Thalheimer, each side retained counsel (Davis, Polk & Wardwell for Mr. Thalheimer and Brobeck, Phleger & Harrison for The Sharper Image), and the result was a detailed and extensive employment agreement dated as of October 21, 2002 (the "Employment Agreement"). See, TSIC Appendix A. Thereafter, Mr. Thalheimer and The Sharper Image consistently treated the Employment Agreement as the binding contract governing their relationship. Thalheimer Dec., ¶3.

Mr. Thalheimer remained The Sharper Image's Chairman and Chief Executive Officer until late in 2006. Although by April of 2006 Mr. Thalheimer's stock ownership had fallen below 20%, he was still The Sharper Image's largest shareholder. Thalheimer Dec., ¶4.

In 2005 a dissident group of shareholders accumulated approximately 12% of the stock of The Sharper Image and sought representation on the Board . In March of 2006, a settlement with that group resulted in its leader, Jerry Levin (hereinafter "Levin"), and two other representatives being given seats on the Board . The three dissidents took their seats on the Board on July 6, 2006. Thalheimer Dec., ¶5.

3

Levin proved implacably opposed to Mr. Thalheimer, and by September of 2006 had convinced the Board to terminate Mr. Thalheimer's employment.    See, TSIC Appendix E and F.  If the termination was without cause,[1] the Board would be required to honor Mr. Thalheimer's Employment Agreement, which called for a substantial Severance Payment.  Thalheimer Dec., ¶6.

At the September 25, 2006 meeting, at which the Board resolved to terminate Mr. Thalheimer, it deferred deciding whether the termination was with or without cause for 30 days, while it obtained further advice and information from The Sharper Image's special counsel, Skadden Arps.  Thalheimer Dec., ¶7.  The Board, now controlled by Levin, searched for a basis to avoid or reduce the Severance Payment, but could not identify any basis for challenging the enforceability of the Employment Agreement or for contending that Mr. Thalheimer's termination was "for cause."  Id., Exelrod Dec., ¶¶7,8.

Ultimately, however, Levin and the Board came up with a claim that could be asserted as a potential partial offset, a claim relating to an April, 2006 restatement of the company's earnings.  Levin argued that since earnings had been restated downwards, Mr. Thalheimer's prior bonus, which had been based on earnings, should be retroactively reduced (the "Stock Restatement Claim").  Thalheimer Dec., ¶8; Exelrod Dec., ¶10.

The parties negotiated with respect to Mr. Thalheimer's severance and the offset for the Stock Restatement Claim from September 25, 2006, when the Board terminated Mr. Thalheimer without cause, until December 22, 2006, when a settlement agreement

---

[1]    It was never seriously suggested that the termination was "with cause." Exelrod Dec., ¶7. Under the Employment Agreement, there were only three bases for termination with cause:  the first required 30 days written notice and a failure to cure, which clearly did not occur; the second was for "willful misconduct… or a material act of fraud against the Company"; and the third was a felony conviction.  See, Employment Agreement, ¶6(c); TSIC Appendix A.

was finally signed (the "Settlement Agreement").  See, TSIC Appendix I.  Exelrod Dec.,

¶12.  The negotiations were intensely adversarial.  Mr. Thalheimer was prevented from

removing his personal effects – including family photographs – from his office until a

settlement was reached.  Indeed, the family photos and a sports coat which had been in

his office closet when Mr. Thalheimer was terminated were literally held hostage until

the settlement agreement had been signed.  Exelrod Dec., ¶¶3-6; Thalheimer Dec., ¶9.

As part of the settlement, Mr. Thalheimer resigned from the Board in December

of 2006.  Although the Settlement Agreement was signed in December of 2006, the

Severance Payment was not funded until April of 2007 as a result of IRS Rule 409A

which prohibits the payment of severance to key employees of a publicly held company

until six months after their termination.  Thalheimer Dec., ¶10.

In April of 2007, Mr. Thalheimer exercised options for 64,000 shares of stock and

immediately sold the stock into the market. Thalheimer Dec., ¶12.

The Severance Payment, net of the offset for the Stock Restatement Claim, was

funded in April of 2007, when due.  At the time, The Sharper Image was abundantly

solvent:  it had a $167 million net equity and $35 million of cash on hand.  The persons

most knowledgeable about The Sharper Image's financial condition, including Levin,

were then actively purchasing more stock. Thalheimer Dec., ¶11.

In May of 2007, a group of sophisticated investors including Ramius Capital, Sun

Capital, and Levin, purchased all of Mr. Thalheimer's stock at $9.25 per share.  At the

time, stock was trading at $11.50 per share, and after news of the trade became public,

the stock price hit its quarterly high, in excess of $13 per share. For present purposes, it

should be noted that no one viewed Mr. Thalheimer's stock as warranting a "control

premium", perhaps because Mr. Thalheimer so demonstrably was unable to exercise *any* type of "control" over The Sharper Image.  In any event, Mr. Thalheimer's stock sold for less than the current price of stock trading in the market.  Following the sale of his stock, Mr. Thalheimer had no further involvement whatsoever with The Sharper Image.  Thalheimer Dec., ¶15.

In sum, following September 25, 2006 when the Board terminated him, Mr. Thalheimer exercised no influence or control over The Sharper Image.  Quite the contrary, Mr. Thalheimer was the object of fierce enmity from the persons controlling The Sharper Image, who dedicated the company's resources to opposing Mr. Thalheimer in every way they could, from the substantive (investigating "for cause" termination, asserting the Stock Restatement Claim) to the petty (holding his sports coat and family photos hostage).

## IV.    DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT SHOULD BE GRANTED

An essential element of the Plaintiff's case is that the transfer was made for "less than a reasonably equivalent value."  Since the transfer was made in satisfaction of an equivalent old, cold and unavoidable antecedent debt, this element of Plaintiff's case can never be met, and the Cross-Motion for Summary Judgment should be granted.

### A.    *The Applicable Legal Test*

The applicable legal test in the Third Circuit is clear.  First, the court must address the threshold issue of whether the debtor received any value from the transfer.  *Pension Transfer Corp. v. Beneficiaries Under the Third Amendment to Fruehauf Trailer Corp. Retire Plan No. 3 (In re Fruehauf Trailer Corporation)*, 444 F.3d 203, 212 (3d Cir. 2006**Error! Bookmark not defined.**)**Error! Bookmark not defined.**; *Mellon Bank,*

*N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.),* 92 F.3d 139, 148 (3d Cir. 1996).  The Third Circuit's definition of "value" is very broad, including "any benefit [,] . . . whether direct of indirect."  *Id.*

"If a court determines that the debtor gained at least some value as a result of the transfer, what follows is a comparison: whether the debtor got roughly the value it gave." *Fruehauf Trailer, supra,* 444 F.3d at 212 -213.  The court addresses this question by applying a totality of the circumstances test.  *Id.* at 212-13.  The totality of the circumstances is determined by reviewing "(1) the fair market value of the benefit received as a result of the transfer, (2) the existence of an arm's-length relationship between the debtor and the transferee, and (3) the transferee's good faith." *Id. at 213* (quoting *In re RML*, 92 F.3d at 148-49, 153).

> The concept of "reasonably equivalent value" does not require a dollar-for-dollar exchange. *In re Perry County Foods, Inc.,* 313 B.R. 875, 895 (Bankr. N.D.Ala. 2004) ( *citing Butler Aviation Intern'l, Inc. v. Whyte* ( *Matter of Fairchild Aircraft Corp.*), 6 F.3d 1119, 1125-26 (5th Cir.1993) ( "Although the minimum quantum necessary to constitute reasonably equivalent value is undecided, it is clear that the debtor need not collect a dollar-for-dollar equivalent to receive reasonably equivalent value."); *Barber v. Golden Seed Co., Inc.,* 129 F.3d 382, 387 (7th Cir.1997) ("We have held that the formula for determining reasonably equivalent value is not a fixed mathematical formula...."). Rather, a factual investigation is needed to determine whether the value of what the transferor received was generally, not exactly, equivalent to the transfers made or the obligations incurred. *In re Viscount Air Services, Inc.,* 232 B.R. 416, 434 (Bankr.D.Ariz.1998) (comparing what the debtor surrendered with what the debtor received in return).

*In re Advanced Telecommunication Network, Inc*.  321 B.R. 308, 329 -330  (Bkrtcy. M.D. Fla., 2005); rev'd on other grounds, 490 F.3d 1325 (11th Cir. 2007).

**B.     *The Payment of Antecedent Debt is Reasonably Equivalent Value***

Payment of a debt can constitute reasonably equivalent value. Section 548(d)(2)(A) ("'value' means… satisfaction… of a present or antecedent debt of the debtor…")  The Severance Payment was in the amount of the severance obligation and hence was precisely "equivalent" to that antecedent debt.

Consistent with the express language of the statute quoted above, the courts have routinely acknowledged that the payment of an antecedent debt constitutes a transfer for reasonably equivalent value and hence is not avoidable as a fraudulent transfer.

> Where a conveyance is supported by an antecedent debt, a grantee of that conveyance may support it when it is attacked as fraudulent by merely pointing to the antecedent debt as the consideration, provided the grantee acted in good faith in accepting it. *Johnson v. Lentini,* 66 N.J.Super. 398, 406, 169 A.2d 208 (Ch.1961); *Hersh v. Levinson Bros., Inc., supra,* 117 N.J.Eq. at 133, 171 A. 736; *Riverside Trust Co. v. Dietrich,* 112 N.J.Eq. 43, 45, 163 A. 275 (1932)

*Telefest, Inc. v. VU-TV, Inc.*  591 F.Supp. 1368, 1377 (D.C.N.J., 1984).

> Fair consideration" includes the satisfaction of an "antecedent debt." A guaranty is an "antecedent debt," and the payment on account of an pre-existing guaranty is, therefore, supported by "fair consideration." *See Official Comm. of Unsecured Creditors v. Conceria Sabrina S.P.A. ( In re R.M.L., Inc.*), 195 B.R. 602, 618 (Bankr.M.D.Pa.1996) (payment of guaranty is given for "reasonably equivalent value"); *Marshack v. Wells Fargo Bank ( In re Walters),* 163 B.R. 575, 581 (Bankr.C.D.Cal.1994) (payment on guaranty was made on account of "antecedent debt").

*In re Nirvana Restaurant Inc.*  337 B.R. 495, 501 -502 (Bkrtcy. S.D.N.Y., 2006**Error! Bookmark not defined.**); and see, *In re O'Day Corp.*  126 B.R. 370, 409 (Bkrtcy. D.Mass., 1991) ("It is well established that the existence of a preexisting debt precludes the finding that a transfer is fraudulent under [§ 548]"); *In re All-Type Printing, Inc.*  274 B.R. 316, 324 (Bkrtcy. D.Conn., 2002)**Error! Bookmark not defined.** ("Satisfaction of an antecedent debt is explicitly acknowledged… to be "value" for purposes of fraudulent transfer analysis. Thus, the individual satisfactions flowing from each Payment provided "reasonably"– indeed, perfectly – equivalent value in exchange for such Payment."); *In*

*re Luis Elec. Contracting Corp.* 149 B.R. 751, 758 -759 (Bkrtcy. E.D.N.Y., 1992) (payments on enforceable contractual liabilities were not avoidable as fraudulent transfers, even though the debtor did not enjoy the benefits of the contracts.); *Commodity Futures Trading Commission v. Probber Intern. Equities Corp.* 504 F.Supp. 1154, 1163 (D.C.N.Y., 1981) ("Since Shiffman's loan was to PIE, PIE's repayment was in satisfaction of an antecedent debt and was therefore, assuming good faith, made for fair consideration."); *In re Sharp Intern. Corp.* 403 F.3d 43, 53 -54 (2nd Cir. 2005) (repayment of antecedent debt not avoidable as a fraudulent transfer, notwithstanding evidence of inequitable conduct by creditor); *In re First Commercial Management Group, Inc.* 279 B.R. 230, 239 (Bkrtcy. N.D.Ill., 2002) (salesman commissions paid to advance a Ponzi scheme were nonetheless non-avoidable payments on antecedent debts owed to the salesmen); *In re Churchill Mortg. Inv. Corp.* 256 B.R. 664, 679 - 680 (Bkrtcy. S.D.N.Y., 2000) (same); *Erie Marine Enter. v. Algoma Central Marine (In re Erie Marine Enter., Inc.)*, 213 B.R. 799, 803 (Bankr. W.D.Pa 1997) ("there is no question that the compromise of a dispute can supply the element of consideration for a contract"); *In re Fritze LLC* 2009 WL 3245499, 7 (Bkrtcy. D.N.J., 2009) ("The settlement agreement was on account of an outstanding debt owed and thus constitutes a transfer of reasonably equivalent value."); *Atlas Corp. v. DeVilliers* 447 F.2d 799, 804 (10th Cir. 1971) (evidence of the existence of an antecedent debt "provides sufficient support for the trial court's determination that the conveyance of stock to Marchiondo was not a fraudulent transfer."); *In re Jodoin* 208 B.R. 6, 10 (Bkrtcy. D.N.H., 1997) (reasonably equivalent "value for a transfer may be an antecedent debt.").

TSIC's opening brief on this subject seems peculiarly indirect and inapt.

First, it quotes at length from Senator Durbin and Senator Kennedy's statements in support of a proposed anti-insider amendment to BAPCPA which was never enacted. See, TSIC Memorandum pages 10-12.  151 Cong. Rec. S1979-01, at S1995 (Cong. Rec. Mar. 3, 2005).  It is not clear why these statements would be relevant to the matter at hand.

Then, TSIC argues that the Debtor must receive something "instrumental" to constitute reasonably equivalent value; TSIC Memorandum page 15; but neither the case cited nor the law generally requires more than a valid antecedent debt, whether "instrumental" or not.

Next, TSIC cites *In re Simone* as though it were relevant, but in that case the fraudulent transfer was made in return for a promise of future services – not an antecedent debt – and an unperformed promise of future support is expressly excluded from the definition of value in the statute.  Section 548(d)(2)(A).  *Simone* is clearly correct, and equally clearly irrelevant.

Finally, TSIC boldly asserts, "the fact that Thalheimer may have been entitled to payment under the Employment Agreement is of no consequence under the statutory provision."  TSIC Memorandum page 15.  Not surprisingly, no authority for that proposition is presented.[2]

---

[2]    The quote that follows the assertion carefully omits the first sentence, reproduced below:

*The trustee will still have to show a lack of fair consideration*. However, this will prevent the insider from raising the defense of fair consideration merely because the employment agreement *authorizes* such disbursements.

Crocker & Waldschmidt, "Impact of the 2005 Bankruptcy Amendments on Chapter 7 Trustees," 79 Am. Bankr. L.J. 333, 354 (2005) (emphasis supplied).  Not surprisingly, the cited article does not assert, and presents no support for, the broad principle that binding contractual obligations are "of no consequence" presented in TSIC's brief.

The Severance Payment was made on account of an antecedent debt – the 2002 Employment Agreement – that matured upon Mr. Thalheimer's termination without cause.  As such, the payment was made for reasonably equivalent value and is not avoidable under Section 548.

### C.    The Antecedent Debt was Incurred in 2002

One of the key changes made by the Bankruptcy Code of 1979 was the abolition of issues regarding "provable" claims and the corresponding broad expansion of the scope of "claims" subject to treatment in bankruptcy.  The Third Circuit explained:

> The definition [of "claim"] is any right to payment, whether or not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured.... By this broadest possible definition and by the use of the term throughout the title 11, especially in subchapter I of chapter 5, the bill contemplates that *all legal obligations of the debtor, no matter how remote or contingent,* will be able to be dealt with in the bankruptcy case. It permits the broadest possible relief in the bankruptcy court.

*Matter of M. Frenville Co., Inc.*  744 F.2d 332, 336 (3rd Cir. 1984)**Error! Bookmark not defined.** (emphasis supplied).

Notably, the new definition of claims extended to "unmatured" and "contingent" claims.

The Third Circuit explained contingent claims as follows:

> Bankruptcy judges have defined a contingent claim as a claim which becomes due only on the occurrence of a future event. *See, e.g., In re Dill,* 30 B.R. 546, 549 (Bankr. 9th Cir.1983). One frequently cited definition of contingent is that "claims are contingent as to liability if the debt is one which the debtor will be called upon to pay only upon the occurrence or happening of an extrinsic event." *In re All Media Properties, Inc.,* 5 B.R. 126, 133 (Bankr. S.D.Tex. 1980), *aff'd,* 646 F.2d 193 (5th Cir. (Unit A) 1981) (per curiam).**Error! Bookmark not defined.**

*M. Frenville, supra,* 744 F.2d at 336 -337 (footnote 7).  Consistent with the broad definition of "claim" under the Code, Mr. Thalheimer's contingent and unmatured right

to the Severance Payment was incurred when the Employment Agreement was signed in 2002, although the obligation to fund the Severance Payment might not come due for several years, if at all.

Indeed, TSIC acknowledges[3] that the antecedent debt was *incurred* when the Employment Agreement became effective in 2002, and the obligation thereafter matured upon Mr. Thalheimer's termination without cause.   "[W]hen a creditor has a claim against a debtor –even if the claim is unliquidated, unfixed, or contingent – the debtor has incurred a debt to the creditor." *Energy Coop., Inc. v. SOCAP Int'l, Ltd. (In re Energy Coop., Inc.),* 832 F.2d 997, 1001 (7th Cir.1987)

The Third Circuit applies a special distinction in this regard between contractual obligation and tort claims.  In the Third Circuit, a tort claim is incurred when the cause of action accrues, potentially well after the operative facts giving rise to the underlying claim occur.  In *Frenville,* the Panel found that a common law claim for indemnity respecting a tort claim was not incurred until the cause of action accrued under applicable tort law.  *Frenville, supra,* 744 at 336-7.

The Third Circuit contrasted a common law tort claim with a *contractual* surety or indemnity as follows:

> The present case is different from one involving an indemnity or surety contract. When parties agree in advance that one party will indemnify the other party in the event of a certain occurrence, there exists a right to payment, albeit contingent, upon the signing of the agreement. *See In re THC Financial Corp.,* 686 F.2d 799, 802-04 (9th Cir.1982); *In re All Media Properties, Inc.,* 5 B.R. 126, 133 (Bankr.S.D.Tex.1980), *aff'd,* 646 F.2d 193 (5th Cir. (Unit A) 1981)**Error! Bookmark not defined.** (per curiam). Such a surety relationship is the classic case of a contingent right to payment under the Code – *the right to payment exists as of the signing*

---

[3]      "TSIC *incurred* the obligation to make the Payment to Thalheimer when TSIC entered into the Employment Agreement, in October 2002."  TSIC Memorandum, page 17 (emphasis supplied).

> *of the agreement, but it is dependent on the occurrence of a future event.*
> *See All Media,* 5 B.R. at 133. A & B, however, had no indemnity
> agreement with the Frenvilles. Accordingly, cases holding that a claim
> arises upon the signing of an indemnity agreement are inapposite.

*Frenville, Id.* (emphasis supplied).

This distinction between contingent contractual claims and tort claims has been

preserved in Third Circuit jurisprudence:

> In ascertaining when the government's right to payment arose, we
> recognize that a party may have a bankruptcy claim and not possess a
> cause of action on that claim. *See Schweitzer,* 758 F.2d at 942 (citing *In re*
> *Radio-Keith-Orpheum Corp.,* 106 F.2d 22, 26-27 (2d Cir.1939)). To be
> sure, *Schweitzer* and *In re Radio-Keith* discussed this principle in the
> context of a more clearly established right to payment. In *Schweitzer,* we
> concluded that an "as yet nonexistent" tort cause of action was not a claim
> for purposes of the Code. *Schweitzer,* 758 F.2d at 943. Nevertheless, we
> noted that a party who contracts with a debtor pre-bankruptcy should not
> be permitted to avoid the consequences of that legal relationship in the
> context of a bankruptcy proceeding. *Id.* Any interest cognizable under the
> Code, however, must stem from "a legal relationship relevant to the
> purported interest from which that interest may flow." *Id.* at 943 (citing *In*
> *re Frenville,* 744 F.2d 332). For example, in *In re Radio-Keith,* the parties
> cognizable interest was a debtor's rent guaranty enabling one of its
> subsidiaries to lease property. *In re Radio-Keith,* 106 F.2d at 26-27.

*In re Remington Rand Corp.* 836 F.2d 825, 831 -832 (3rd Cir. 1988).

In 2002, upon entering into the Employment Agreement, the Debtor

incurred a contingent obligation to Mr. Thalheimer, to pay severance in the event

of a termination without cause.    Under Third Circuit jurisprudence, that

contingent claim arose and was incurred in 2002.    It simply became non-

contingent and matured when the Board fired Mr. Thalheimer without cause in

September of 2006.

### D.    The 2002 Employment Agreement is Not Avoidable

It must be acknowledged that if the antecedent debt is avoidable, it will not

constitute "reasonably equivalent value" for the purposes of the fraudulent transfer laws.

13

*Nirvana Restaurant, supra,* 337 B.R. at 502  ("Conversely, if the Guaranty is avoided as a fraudulent obligation, it cannot serve as "fair consideration" for the subsequent Transfers."); *All-Type Printing, supra,* 274 B.R. at 324 ("the underlying analysis would be different had the Trustee also sought and obtained an avoidance of the incurring of that obligation. In that event the Payments could no longer be supported by the value of debt satisfaction since no debt would exist.")

Here, however, there can be no contention that the 2002 Employment Agreement is avoidable.  As noted, the Board established a committee to negotiate the terms of the Employment Agreement, each side retained separate counsel, and the Employment Agreement was negotiated at arm's length.   Even if there were some substantive justification for avoidance[4], any such claim would clearly be barred by the statute of limitations. *See* Section 548(a), establishing a two year avoidance reach-back period.

Instructive in this regard is *Mills v. Everest Reinsurance Co*., 623 F. Supp. 2d 447, 452 -454 (S.D.N.Y. 2009) in which an insurance Rehabilitator sought to avoid payments made with respect to a reinsurance contract.  The Rehabilitator argued that the contract had been entered into by mistake and should be rescinded, but the Court rejected all challenges to the underlying contract on the grounds that the statute of limitations had expired.  It then concluded that, although the payments themselves were made within the fraudulent transfer statute of limitations period, those constituted payments on account of an antecedent debt – the contract – and hence were not avoidable.   If the contract could

---

[4]    TSIC seems to argue that Mr. Thalheimer should have been content to work for his salary, and that the severance benefit should be treated as an unnecessary "extra."  See TSIC Memorandum, page 16.  The simple answer to that contention is that the Employment Agreement specified the rights of the parties, not TSIC's *post hoc* recasting of the agreement it would, in retrospect, have preferred.

not be challenged, payments under the contract could not be challenged.  Precisely the same situation and analysis apply here: whatever complaints TSIC may have about the Employment Agreement, it was a binding contract and is not avoidable, and so the payments required by the Employment Agreement cannot be avoided because they were made on account of that antecedent debt.

### E.    Conclusion Regarding Reasonably Equivalent Value

The statute in question authorizes avoidance of "any transfer… or any obligation…under an employment contract) … that was made or incurred within 2 years before the date of the filing of the petition if the debtor… received less than a reasonable equivalent value in exchange for such transfer or obligation…"  Section 548(a)(1).

As discussed above – and as TSIC expressly agrees – the relevant "obligation" was "incurred" in October of 2002 under the Employment Agreement.  That obligation was incurred far beyond the 2-year period contemplated by Section 548 and was, notwithstanding TSIC's bold assurances to the contrary, not subject to avoidance.  The severance obligation under the Employment Agreement is old, cold and unavoidable.

While the "transfer" – the Severance Payment – did occur within two years of the bankruptcy filing, it was made on account of a precisely equivalent value: the antecedent debt under the Employment Agreement, which matured and became non-contingent when Mr. Thalheimer was fired without cause.  Neither the obligation nor the transfer is avoidable.

## V.    PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT MUST BE DENIED

### A.    Plaintiff's Contentions

The Plaintiff seeks to avoid the Severance Payment as a transfer made "to or for the benefit of an insider… under an employment contract and not in the ordinary course of business."  Section 548(a)(1)(B)(ii)(IV).  Thus, in order to prevail, the Plaintiff must demonstrate that (a) the transfer was made within two years of the bankruptcy filing, (b) the transfer was made under an employment contract, (c) the transfer was made to an "insider", and (d) the transfer was not made in the ordinary course of business.  The Plaintiff can never prevail on the third element; for present purposes, there are triable issues of fact precluding the granting of Summary Judgment respecting the third and fourth elements.

### B.      The Transfer was Not Made to an Insider

TSIC proceeds under a statute that renders avoidable a "transfer made to or for the benefit of an insider."  Section 548(a)(1)(B)(ii)(IV).   At the time the transfer was made, Mr. Thalheimer was the opposite of an insider: he did not fall within the statutory definition of an insider and, as an object of enmity and derision; he clearly did not constitute a non-statutory insider.  TSIC will never prove a key element of its claim; for present purposes, it certainly has not established that element so as to permit entry of summary judgment.

### 1.      Mr. Thalheimer Was Not A Statutory Insider.

Mr. Thalheimer was terminated as an officer of The Sharper Image on September 25, 2006.  TSIC Appendix F.  Mr. Thalheimer resigned as a director of The Sharper Image on December 22, 2006.  He occupied none of the roles enumerated by Section 101(31)(B) during the year preceding the bankruptcy filing or when the Severance Payment was received.  Thalheimer Dec., ¶10.

Mr. Thalheimer also did not occupy the role identified by Section 101(31)(E) because throughout the relevant period his stock ownership – viewed as broadly as possible – did not exceed 18.4%. See, Section 101(2)(A) (defining an "affiliate" as owning 20% or more of the Debtor's stock). During the relevant period, Mr. Thalheimer held about 2.4 million shares through his family trust, and an entirely independent trust (with an entirely independent trustee) held about 250,000 shares for the benefit of Mr. Thalheimer's children; aggregate shareholdings between the two yields 2,692,458 share. See, Thalheimer Dec., ¶¶13-14. As of July, 2007, there were an aggregate of 15,149,247 outstanding shares, of which the foregoing constituted 17.77%.[5]  Id. Mr. Thalheimer's shareholdings, construed as broadly as possible, did not reach the 20% threshold required of an "affiliate" "insider."

Thus, Mr. Thalheimer was not a statutory insider either during the year preceding the bankruptcy filing or when he received the Severance Payment.

## 2.    Mr. Thalheimer Was Not A Non-Statutory Insider.

The statutory definition of "insider" makes use of the word "includes" and the courts have followed the rule of interpretation set forth in Section 101(3) of the Code to conclude that relationships with the Debtor other than the statutorily enumerated categories may nonetheless suffice to confer insider status upon the creditor.

The analysis is a practical one, focusing on the extent to which the creditor exercised control over the Debtor at the relevant time:

---

[5]    Adding the option for 64,000 shares which was exercised and the shares immediately sold in April of 2007 increases the percentage to 18.195%. Measuring the stock holdings against the 14,973,397 shares that were outstanding in January of 2007 increases the percentages to 17.98% and 18.4%, respectively.

Courts generally look to the legislative history to determine whether an entity or person qualifies as a non-statutory insider, which states, "An insider is one who has a sufficiently close relationship with the Debtor that his conduct is made subject to closer scrutiny than those dealing at arm's length with the Debtor." [cite omitted] "In cases involving non-management creditors, a creditor will be held to an insider standard when it is found that it dominated and controlled the Debtor." [cite omitted] Courts have "applied insider" status "flexibly to include a broad range of parties who have a close relationship with the Debtor," focusing on the "closeness between the transferee and the Debtor", the *degree of control or influence* the transferee exerts over the Debtor, and whether the transactions were conducted at arm's length. [cite omitted] More specifically:

> In determining whether a creditor… has the requisite level of control to be an insider, the courts examine whether the creditor had more *ability to assert control* than the other creditors, whether the creditor made management decisions for the Debtor, directed work performance, and directed payment of the Debtor's expenses. [cite omitted] There must be day-to-day control, rather than some monitoring or exertion of influence regarding financial transactions in which the creditor has a direct stake.

*In re Oakwood Homes Corp.* 389 B.R. 357, 366 (D.Del. 2008) (emphasis supplied). See also, *In re Winstar Communications, Inc.* 348 B.R. 234, 279 (Bankr.D.Del. 2005) (Noting that some courts "have used terminology such as having a 'stranglehold' over the Debtor, having 'complete domination' of the Debtor," but concluding that "The true test of 'insider' status is whether one's dealings with the Debtor cannot accurately be characterized as arm's-length. [cite omitted] The emphasis is on the nature of the relationship between Debtor and the other person, especially on whether their relationship gave the other person the power or influence to have a debt owed to it repaid.")

Here, Mr. Thalheimer had no "degree of control or influence," ability to "make management decisions for the Debtor" or "power" or "influence" to have the Severance

Payment allowed or paid – quite the contrary, The Sharper Image's Board was actively searching for any reason *not to pay* the severance obligation, and were simply unable to concoct a plausible excuse.  Thalheimer Dec., ¶¶15-16.  Far from enjoying a "close" and "not arms-length" relationship, The Sharper Image's relationship to Mr. Thalheimer was intensely adversarial, including such petty hostilities as holding Mr. Thalheimer's family photos and sports coat hostage.

Indeed, the case which most closely resembles the current situation is *In re Pittsburgh Cut Flower Company, Inc.*, 124 B.R. 451 (Bankr. W.D. Pa. 1991) in which the Debtor's former partner had agreed to be bought out through payments over time, and the Debtor's estate sought to avoid the payments made during the year pre-petition.  The court noted that the Defendant's relationship had been at times "adversarial" to the Debtor, the Defendant "was in no position to exercise dominion and control over the Debtor" and the buy-out agreement had been negotiated at arm's-length.  The court concluded that the Defendant, although a former partner of the Debtor, could not be characterized as an "insider."

Thus, the *Pittsburgh Cut Flowers* court expressly rejected the "once an insider, always an insider" approach on which Plaintiff's claims depend.  The "plain meaning" of the statute would seem to reject it as well.[6]

3.     Conclusion re: Insider Status

It appears that Mr. Thalheimer was neither a "statutory insider" nor a "non-statutory insider" as a matter of law.  If the Court so rules, the Defendant's Cross-Motion

---

[6]     The operative language of the statute allows the avoidance of a "transfer to or for the benefit of an insider", strongly suggesting that the transferee must be an insider when the transfer is made.  Section 548(a)(1)(B)(IV).  Clearly, Congress could have avoided transfers to "current or former insiders" had it wanted to do so.

must be granted and the Adversary Proceeding must be dismissed, since insider status is an essential element of Plaintiff's case.

In any event, the circumstances set forth above demonstrate that the Court cannot find Mr. Thalheimer to have been an "insider" on the record presented.   Since Mr. Thalheimer demonstrably was not a statutory insider, Plaintiff can prevail only if he is found to be a non-statutory insider, which clearly requires a fuller factual record. Summary judgment in favor of the Plaintiff must be denied

### C.    There are Triable Issues of Fact Respecting the Ordinary Course of Business

An essential element of the Plaintiff's case is that the payments were not made "in the ordinary course of business."   TSIC asserts that for payments to be in the ordinary course of business, they must be "recurring and customary" and announces that the payments at issue clearly were not in the ordinary course of business.

TSIC's limited analysis is flawed.  First, while payments in the ordinary course of business may often be "recurring", that is not a critical requirement.  It is well established that a single transfer can nonetheless be made in the ordinary course of business.  The majority rule is

> that a transaction may be in the "ordinary course" even if it is the very first transaction between the debtor and the creditor. *E.g., Gosch v. Burns ( In re Finn),* 909 F.2d 903, 907 (6th Cir.1990); *Hovis v. Stambaugh Aviation, Inc. ( In re Air South Airlines),* 247 B.R. 165, 171-72 (Bankr.D.S.C.2000); *Tomlins v. BRW Paper Co. ( In re Tulsa Litho Co.),* 229 B.R. 806, 808 (10th Cir. BAP 1999); *Remes v. ASC Meat Imports, Ltd. (In re Morren Meat & Poultry Co.),* 92 B.R. 737, 740 (W.D.Mich.1988).
>
> We concur with those courts that have rejected the above *per se* rule. A first-time transaction between a debtor and a creditor in certain circumstances may qualify as an ordinary course transaction for purposes of § 547(c)(2)(B).

*In re Forman Enterprises, Inc.* 293 B.R. 848, 857 (Bkrtcy.W.D.Pa.,2003); *In re Finn,* 909 F.2d 903, 908 (6th Cir. ,1990) ("a transaction can be in the ordinary course of financial affairs even if it is the first such transaction").

TSIC's second characteristic – "customary" – is probably closer to the mark when considering the ordinary course of business. It is manifestly "customary," however, for abundantly solvent companies – as the Debtor was at all relevant times – to pay their debts as they come due. At the time of the Severance Payment, the Debtor had $167 million in net equity. Thalheimer Dec., ¶11. That is all that occurred in this case: termination of Mr. Thalheimer's Employment Agreement without cause gave rise to an obligation to pay severance and, although the Board would have preferred not to do so, upon concluding that it was legally obligated to pay the severance obligation, it did so. The payment of debts as they come due – even disagreeable ones – is a cornerstone of the "ordinary course of business" in America. Arguments to the effect that this debt was larger than others, or that this employee was different from the others, miss the point: paying a debt as it comes due is precisely what solvent companies do in their ordinary course of business. And see, *In re Bernard Technologies, Inc.*, 298 B.R. 526 (Bkrtcy. D. Del. 2008) (payments of wages, expense reimbursements and loan repayments to founder and former chief executive officer fell within ordinary course of business). Since the payment was made when the debt to the Defendant came due, it was made in the ordinary course of business, defeating a key element of TSIC's case.

In any event, this issue cannot be decided in TSIC's favor without a more fully developed factual context. Instructive in this regard is *In re CVEO Corp.* 320 B.R. 258, 263 - 264 (Bkrtcy. D.Del., 2005). In *CVEO,* the representative of the estate attempted to

avoid the pre-petition payment of fees to an investment banker representing the unofficial creditors committee in a pre-bankruptcy work-out.  The Defendant elicited testimony to the effect that the Debtor agreed to pay the fees "because it thought the Agreement was in its own best interests, and that the Debtor derived benefit from the services provided by Chanin to the Committee."  Much as occurred here, the Plaintiff urged a narrow interpretation of the ordinary course of business defense, asserting that it was not available because the payment at issue was not a common or recurring transaction for the Debtor.  ("The Plaintiff argues that it clearly was not in the ordinary course of the Debtor's business, which was the manufacture and sale of sneakers. The Debtor was not in the habit of paying the fees of its creditors' professionals.")  The Bankruptcy Court concluded that there were triable issues of fact and declined to grant summary judgment on the ordinary course of business defense.

If the Court concurs that the payment of debts as they come due falls within the "ordinary course of business", it should grant the Cross-Motion for Summary Judgment. Otherwise, it should defer this issue until a fuller record is presented at trial.

## V.    CONCLUSION

The Payment at issue was made at arm's-length, when the Debtor was abundantly solvent, in satisfaction of a valid and binding contractual obligation – an antecedent debt – then more than four years old.  As a matter of law, the Payment was made for reasonably equivalent value, and so Defendant's Cross-Motion for Summary Judgment should be granted.

The Plaintiff's Motion for Summary Judgment should be denied.  The Defendant was not an "insider" when the Payment was made; indeed, he was the opposite: he

exercised no control over the Debtor (which had by then become expressly hostile toward him) and was required to sell his stock at a discount to market prices.  In any event, "insider" status and the contention that the payment was made "outside the ordinary course of business" are intensely factual issues that can only be resolved after trial on the merits.

Dated:  November 18, 2009            /s/ Garvan F. McDaniel                                    
                                     Garvan McDaniel (#4167)
                                     BIFFERATO GENTILOTTI LLC
                                     800 N. King Street, Plaza Level
                                     Wilmington, DE 19801
                                     302-429-1900
                                     302-429-8600 (fax)

                                     -and-

                                     Michael St. James (Admitted *Pro Hac Vice*)
                                     ST. JAMES LAW, P.C.
                                     155 Montgomery St., Suite 1004
                                     San Francisco, CA 94104
                                     415-391-7566
                                     415-391-7568 (fax)
                                     Attorneys for Richard Thalheimer