## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| TSIC, INC., f/k/a THE SHARPER IMAGE, | ) | |
| CORPORATION, | ) | Case No. 08-10322 (KG) |
| | ) | |
| Debtor. | ) | Jointly Administered |
| | ) | |
| TSIC, INC., f/k/a THE SHARPER IMAGE, | ) | |
| CORPORATION, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Proc. No. 08-51902 (KG) |
| | ) | |
| RICHARD THALHEIMER | ) | |
| | ) | |
| Defendant. | ) | **Re Dkt Nos. 11, 12, 16-19, 30-31** |

## OPINION ON
## CROSS-MOTIONS FOR SUMMARY JUDGMENT

### Counsel for TSIC, INC., f/k/a The Sharper Image Corporation /Plaintiff

WOMBLE CARLYLE SANDRIDGE
& RICE, PLLC
Steven K. Kortanek, Esquire
Wilmington, DE 19801

WEIL, GOTSHAL & MANGES LLP
Harvey R. Miller, Esquire
Alan R. Kusinitz, Esquire
Abigail Zigman, Esquire
New York, NY 10153

### Counsel for Richard Thalheimer/Defendant

BIFFERATO GENTILOTTI LLC
Garvin F. McDaniel, Esquire
Wilmington, DE 19899

ST. JAMES LAW, P.C.
Michael St. James, Esquire
San Francisco, CA 94104

# I. **INTRODUCTION**[1]

On December 31, 2008, TSIC, Inc. f/k/a Sharper Image Corporation (the "Debtor"), filed a complaint commencing this adversary proceeding seeking to avoid a $6,055,000 severance payment made to former director and Chief Executive Officer ("CEO") Richard Thalheimer ("Thalheimer").  The Court has before it cross motions for summary judgment. Debtor filed a motion for summary judgment requesting the Court to find that the severance payment is an avoidable fraudulent transfer pursuant to Sections 11 U.S.C. §§ 548(a)(1)(B)(i) and (ii)(IV), of the United States Bankruptcy Code (the "Code"). Thalheimer also filed a motion for summary judgment requesting the Court to find that the severance payment is not a fraudulent transfer and therefore to dismiss the adversary proceeding or, in the alternative, to deny Debtor's motion (collectively the "Motions"). The parties fully briefed the Motions and the Court heard oral argument on March 22, 2010.

The Court will grant the Debtor's motion for summary judgment and deny Thalheimer's cross-motion for summary judgment.

# II. **JURISDICTION**

The Court's jurisdiction rests upon 28 U.S.C. §§ 157(b)(1) and 1334(b) and (d).  The adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B) and (O).

---

[1] "The court is not required to state findings or conclusions when ruling on a motion under Rule 56. . . ." Fed. R. Bankr. P. 7052(a)(3).  Accordingly, the Court herein makes no findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

### III. <u>STANDARD OF REVIEW</u>

Federal Rule of Civil Procedure 56, made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7056, provides for summary judgment where "the pleadings, the discovery and disclosure material on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Fed. R. Bankr. P. 7056. On a motion for summary judgment, the moving party must demonstrate that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). An issue of material fact is considered genuine if the evidence is such that a finder of fact could reasonably return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A properly supported motion for summary judgment "will not be defeated by the mere existence of some factual dispute between the parties," unless the dispute over those facts has the potential to affect the lawsuit's outcome. *Orsatti v. N.J. State Police*, 71 F.3d 480, 482 (3d Cir. 1995).

The moving party bears the initial burden of proving an absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323; *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976), *cert denied*, 429 U.S. 1038 (1977). "Once a case has been made in support of summary judgment, [the burden shifts and] the party opposing the motion has the affirmative burden of coming forward with *specific* facts evidencing a need for trial." *Ponzoni v. Kraft General Foods, Inc.*, 774 F.Supp. 299, 308 (D.N.J.1991), *aff'd,* 968 F.2d 14 (3d Cir.1992)(emphasis in original); *Anderson*, 477 U.S. at 250.

3

Because only the existence of a genuine issue of fact can defeat a motion for summary judgment, "there is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* (citations omitted). Additionally, when parties submit cross-motions for summary judgment "each motion must be considered on its own merits, and both may be denied." William W. Schwarzer, et al., *The Analysis and Decision of Summary Judgment Motions,* 139 F.R.D. 441, 499 (1992). Further, "even though each party believes it is entitled to recover as a matter of law, genuine factual disputes may remain" and "courts are no more permitted to resolve such disputes on cross-motions for summary judgment than on a single motion." *Id.*

## IV.  <u>FACTS</u>

### A. The Employment Agreement

In 1977 Thalheimer became Debtor's CEO, majority shareholder and chairman of the board of directors. (Declaration of Richard Thalheimer "Thalheimer Decl." ¶ 2). Thalheimer retained all three roles until 2002, when Thalheimer's ownership fell below fifty percent of the outstanding shares of Debtor and he was no longer the majority shareholder. (Thalheimer Decl. ¶ 3). Thalheimer served as CEO without the benefit of an employment contract until October 21, 2002, when he entered into a formal written employment contract with Debtor. (Thalheimer Decl. ¶ 3). Thalheimer and Debtor were each represented by their own counsel

and executed a valid arm's length agreement (the "Employment Agreement") (Thalheimer

Decl. ¶ 3). The Employment Agreement provided, in pertinent part, that Thalheimer would

receive a base salary of $850,000 dollars subject to review, an executive retirement package

under a supplemental executive retirement plan ("SERP"), and a severance package upon

termination of his employment regardless of cause. (Adversary Docket No. 12 at "Appendix

A," referred to as "Employment Agreement").

In March 2006, Knightspoint Capital Partners ("Knightspoint"), a private equity

group, became Debtor's majority shareholder and demanded board representation.

(Thalheimer Decl. ¶ 3). To avoid a proxy fight, Thalheimer reached an agreement with

Knightspoint whereby Thalheimer remained a director and CEO. (Adversary Docket No. 12

at "Appendix B," referred to as "Thalheimer Dep." at 37 & 38). The agreement also required

some existing board members to resign. (Thalheimer Dep. at 37-38). In July 2006, Debtor

held elections and Debtor's new board was comprised of three directors previously selected

by Thalheimer, three Knightspoint directors, and three independent directors. (Thalheimer

Dep. at 37-38). Among the three Knightspoint directors was Jerry Levin ("Levin"), a highly-

regarded business turnaround specialist. (Thalheimer Dep. at 46). In August 2006, Levin

requested a board meeting and following that meeting Thalheimer received notice that the

Knightspoint directors intended to replace him as CEO. (Thalheimer Dep. at 77, 85 & 109).

## B. The Settlement Agreement

On September 25, 2006, the Debtor's board of directors held a meeting and passed a special resolution officially terminating Thalheimer as CEO. (Thalheimer Decl. ¶ 7). Following the meeting, Thalheimer received notice of his termination. The notice failed to state whether he was being removed with or without cause. (Thalheimer Decl. ¶ 7). Instead, the notice only stated that the board of directors would reach its determination of cause or no cause within thirty days. (Thalheimer Decl. ¶ 7). On October 24, 2006, Thalheimer and Debtor entered into a tolling agreement which gave Debtor's board of directors additional time to decide whether Thalheimer should be removed with or without cause. (Adversary Docket No. 12 "Appendix H," referred to as "Emails").

As a result of negotiations, Thalheimer and Debtor entered into a "Settlement Agreement" in December 2006 that provided for Thalheimer to receive $1.775 million in severance, $3.9 million in SERP benefits, $300,000 in secretarial and office allowances, and up to $800,000 in reasonable attorney's fees in negotiating the Settlement Agreement. (Adversary Docket No. 12 at "Appendix I", referred to as "Settlement Agreement" at 1). As a condition to signing the Settlement Agreement, the board of directors required Thalheimer to resign and waive any future claim or lawsuit against the Debtor. (Settlement Agreement at 3-5).

### C. Severance Payment

Thalheimer resigned from the board of directors in December 2006. (Decl. Thalheimer ¶ 10).  However, tax consideration, 26 U.S.C.A. § 409A ("IRS Rule 409A"), prevented Debtor from paying Thalheimer's $6,055,000 severance until April 2007. ( Thalheimer Decl. ¶ 10). In April 2007, Thalheimer received his severance from Debtor and less than a year later, Debtor commenced this bankruptcy case by filing a voluntary Chapter 11 petition. (Thalheimer Decl. ¶ 10).

## IV.  DISCUSSION

There are four central legal issues confronting the Court on the cross-motions for summary judgment as to which there are no material facts in dispute:

1.      Is a transferee's entitlement to a severance payment fixed on the date the transfer was made or when a debtor incurred the obligation?

2.      Is the relevant time for purposes of Section 548 when the transfer is made or the underlying contract date?

3.      Does a severance payment constitute satisfaction of an antecedent debt that establishes reasonably equivalent value?

4.      Is a severance payment to an insider a transfer made in the ordinary course of business?

A.    **Applicable Law**

A fraudulent transfer under Section 548(a)(1)(B) entitles the trustee to avoid any transfer or obligation incurred by the debtor if the transfer was made or incurred on or within two years before debtor's bankruptcy and the debtor "received less than a reasonably equivalent value in exchange" for that transfer.   Section 548 covers two types of fraud: actual fraud under Section (a)(1)(A), and constructive fraud under Section (a)(1)(B). At issue is whether Thalheimer's severance was a constructive fraudulent transfer. Pursuant to 548(a)(1)(B)(ii)(IV)[2], the trustee must demonstrate that a transfer or obligation was incurred for less than reasonably equivalent value and then must show that one of the four conditions set forth in subsection (B)(ii) is met, including: the debtor was or thereby became insolvent, the debtor was engaged in business or was about to engage in business for which any property remaining with the debtor was an unreasonably small capital, the debtor intended to incur or believed it would incur debts that would be beyond its ability to repay as they matured, or  the debtor made the transfer or incurred the obligation to or for the benefit of an insider under an employment contract and not in the ordinary course of business. 11 U.S.C. § 548(a)(1)(B)(i), (ii)(I)-(IV) (2010). Fraud upon creditors is presumed once the plaintiff establishes the requisite elements of the statute. *See In re Fruehauf Trailer Corp.*,

---

[2]  Section 548(a)(1)(B)(ii)-(IV) provides a transfer is avoidable when a debtor:
>  (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>> (IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

8

444 F.3d 203, 210 (3d Cir. 2006) (citing *Mellon Bank, N.A. v. Metro Comms., Inc.*, 945 F.2d

635, 645 (3d Cir.1991)).

### B.    Thalheimer's Severance Payment Was Made Within Two Years Before The Filing Of Debtor's Petition

An issue in this case is whether the transfer was "made or incurred" within the two-

year look-back period of Sections 548(a)(1)(B)(i) and (ii)(IV).  The Court refers to both the

legislative history and plain meaning of Section 548.

In 2005, Congress made substantial changes to the Code through the enactment of the

*Bankruptcy Abuse Prevention and Consumer Protection Act of 2005* ("BAPCPA").  Relevant

to the present case was BAPCPA's amendment to Section 548 which enhances the ability to

recover avoidable transfers and excessive prepetition compensation, such as loans and

bonuses paid to corporate insiders of a debtor.  The amendment brought two changes that

made it easier for a trustee to avoid pre-petition transfers. First, the amendment extended the

one-year reach-back period for fraudulent transfers to two years.  Second, it amended

subsection (a) to permit the recovery of any transfer to or obligation incurred for the benefit

of an insider under an employment contract.  (H. Report No. 109-31 to accompany S. 256,

109th Cong., 1st Sess. (2005) pp. 132, 134, 154; *available at* 2005 U.S.C.C.A.N. 88, at 192,

194, 211).

Comments addressing the purpose of the 2005 amendment make it clear that Congress

intended to eliminate excessive insider payments under employment contracts that prejudice

general unsecured creditors in light of the Enron and WorldCom bankruptcy cases. 151

Cong. Rec. S1979-01, 2005 WL 4977395 at *21-26 (Cong. Rec. Mar, 2005). As Senator Richard J. Durbin stated: "[M]y amendment would address fraudulent transfers made by corporate insiders, all those huge payouts and loans and bonuses and transactions that went to these corporate executives as the company was headed to bankruptcy." 151 Cong. Rec. S1979-01, 2005 WL 4977395 at *21-26 (Cong. Rec. Mar, 2005). Several critical commentaries note that the statute "makes a transaction avoidable as constructively fraudulent without any reference whatsoever to the financial condition of the debtor." Hon. Bruce A. Markell, Changes to Avoiding Powers Brought About by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005. SL068 ALI-ABA 247 (2005): *Collier On Bankruptcy* (15th ed.) § 548.05. The significance of the amendment is the elimination of proof of insolvency when a payment or transfer is to an insider and the party challenging the transfer establishes the other requirements.

Thalheimer argues, contrary to Congressional intent, that the severance payment is barred by the two-year requirement of Section 548 because the Debtor incurred an obligation that was contingent upon his termination dating back to the date of the Employment Agreement in 2002. (Adversary Docket No. 17 referred to as "Thalheimer Brief" at 11-12). In support of his argument, Thalheimer cites several Third Circuit cases that require a court to adopt the date of the underlying agreement in determining if a claim accrued within two years prior to the bankruptcy. (Thalheimer Brief at 12-13).

10

In response, Debtor asserts that a plain reading of Section 548 compels the conclusion that a trustee can avoid any transfer that was either made or incurred within two years of the bankruptcy. (Adversary Docket No. 30 referred to as "Debtor Letter" at 3-4). Debtor argues that Section 548 includes transfers that were made or incurred within two years prior to the petition date. (Debtor Letter at 3-4). Here, the Debtor asserts that because the transfer was incurred by virtue of the Settlement Agreement in December 2006, the transfer is within the statutory two-year period. (Debtor Letter at 4).

The instant case presents the very situation that Congress intended to remedy when amending Sections 548(a)(1)(B)(i) and (ii)(IV). Debtor incurred Thalheimer's severance in December 2006 while Thalheimer was still a member of Debtor's board of directors. While Thalheimer did not receive payment until April 2007, after he was a director, the effect of incurring the obligation under the Settlement Agreement unduly prejudiced the general unsecured creditors. Section 548 addresses when transfers were "made or incurred"— not when transfers were received. The Court further agrees with Debtor's plain reading of Sections 548(a)(1)(B)(i) and (ii)(IV) that a trustee "may avoid any transfer . . . incurred by the debtor, that was *made or incurred on or within 2 years before the date of the filing of the petition . . . .*" (emphasis added). Construing the statute to apply only when the Debtor made the transfer would contradict the plain meaning of the statute and undermine legislative intent. If Thalheimer were correct, insiders could orchestrate the timing of the transfers, i.e., the payment of severance benefits, to occur after resignation when they were no longer

11

insiders. The Court further notes that while Thalheimer devotes much of his argument to citing Third Circuit case law, none of the cases cited involve fraudulent transfers made to insiders pursuant to Section 548. For these reasons, the Court finds that the severance payment to Thalheimer satisfies the two-year requirement.

### C.    Thalheimer Was A Statutory Insider When He Executed The Employment Agreement

The issue of the time frame in which a transferee has statutory insider status is one of first impression in this District but is an issue which other courts have addressed. Under Third Circuit precedent, the determination of an insider is "best described as a mixed question of law and fact." *In re Winstar Communications, Inc.*, 554 F.3d 382, 394 (3d Cir. 2009). The definition of "insider" under the Code is flexible and not amenable to precise formulation. An insider is any person or entity whose relationship with a debtor is sufficiently close that any transactions between them ought to be subjected to closer scrutiny than those occurring at arm's length. *In re Dan-Ver Enterprises, Inc.,* 86 B.R. 443, 449 (Bankr.W.D. Pa.1988). There are two types of insiders for the purposes of Section 548: statutory insiders pursuant to Sections 548(a) and 101(31) of the Code, and non-statutory insiders as defined in *In re Winstar Communications, Inc.*, 554 F.3d at 394[3]. The description of an "insider" to a debtor corporation under Section 101(31) includes any of the following: (i) director; (ii)

---

[3] The court in *Winstar* carefully analyzed the "nonstatutory insider" status issue and held that the supplier qualified as such. The court held that actual control is not necessary to deem a person or entity a nonstatutory insider. The determination turns on whether the creditor's close relationship to the debtor suggests the absence of arm's length in a transaction. *Winstar*, 554 F.3d at 396-97.

officer; (iii) person in control; (iv) partnership in which the debtor is a general partner; (v) general partner of the debtor; or (vi) relative of a general partner, director, officer, or person in control of the debtor. 11 U.S.C. § 101(31)(B).

In *In re Pittsburgh Cut Flower Company, Inc.*, 124 B.R. 451 (Bankr. W.D. Pa. 1991), the Western District of Pennsylvania held that in determining whether a transferee is an insider, the pertinent time is the date of their agreement. *Id.* at 460. In *Pittsburgh*, the debtor and defendant entered into a partnership agreement to construct warehouses. *Id.* at 454. Defendant, a general partner, owned forty percent of the partnership while the debtor, a limited partner, owned sixty percent. *Id.* at 454-455. Over time, defendant became a limited partner and then sold his interest in the partnership to the debtor. *Id.* at 455. Five months after the sale, debtor filed for bankruptcy and sought to avoid the sale asserting it was a fraudulent conveyance made to an insider. *Id.* at 456. The court in *Pittsburgh* concluded that the sale was not avoidable because defendant was not a general partner (i.e. an insider) at the time of the sale. *Id.* at 456.

While the facts and circumstances of *Pittsburgh* are quite different than the facts in this case, the recent decision in *In re TransTexas Gas Corp.*, 2010 WL 447323 (5th Cir. Feb. 10, 2010), appears to address closely the situation before the Court. In *TransTexas* ("TransTexas"), TransTexas entered into a three-year employment contract with its founder, CEO, and chairman of the board of directors, John Stanley ("Stanley"). *Id.* at *1. The employment contract provided that in the event of termination, Stanley would be entitled to

13

$3 million if the termination was without cause and $1.5 million in the event the termination occurred with cause. *Id.* If Stanley voluntarily left, he would receive no severance. *Id.* Less than one year prior to debtor's bankruptcy, debtor's board of directors decided to terminate Stanley. *Id.* at *1-2. After this meeting, Stanley entered into discussions with debtor's board of directors and executed a separation agreement that expressly superceded the employment contract and provided Stanley a severance payment of $3 million upon his resignation as CEO and director. *Id.* at *2. Three months after Stanley's termination, the debtor filed its bankruptcy. *Id.* When determinating if Stanley was an insider, the court held that pursuant to Section 548, "there is no textual limitation of insider status to the time in which the transfer is made" and for the purposes of Section 548 "it was "enough" that Stanley was undisputably an insider at the time he entered into the relevant obligation." *Id.* at 5.

In his motion, Thalheimer urges the Court to consider the date Thalheimer received his severance payment for the purposes of determining whether he was an insider under Section 548 of the Code. (Thalheimer Brief at 17). Thalheimer alleges that neither case law nor legislative history supports a finding that the date of an employment contract can be used to make this determination. (Adversary Docket No. 19 referred to as "Reply Thalheimer Brief" at 8-9) Thalheimer further asserts that the date of receiving the severance payment should be used because IRS Rule 409A precludes public companies like Debtor from making severance payments until six months after terminating an insider. (Thalheimer Brief at 5). Thalheimer also concludes that he is not neither a statutory nor a non-statutory insider

14

because he did not occupy any of the statutorily defined positions and did not have any degree of control or influence over the Debtor when he received his severance payment in April 2007. (Thalheimer Brief at 18).

In opposing Thalheimer's contentions, Debtor requests that the Court use the date of the Employment Agreement for the purposes of determining Thalheimer's insider status. (Adversary Docket No. 18 referred to as "Debtor Reply Brief" at 13). Debtor contends that using the date of receiving the severance payment is contrary to Congressional intent and is not supported by the case law that addresses constructive fraudulent transfers. (Debtor Reply Brief at 14-17). Debtor lastly argues that IRS Rule 409A should not be used as a method for circumventing the Code to permit corporate insiders from receiving excessive severance payments. (Debtor Reply Brief at 14).

The Court finds that the date of an employment contract determines whether a transferee is an insider for purposes of Section 548. Both the *Pittsburgh* and *TransTexas* decisions, as well as Congressional intent, clearly support this finding and to conclude otherwise would completely undermine the purpose of the 2005 amendment. As stated previously in the Court's ruling, the purpose of the BAPCPA amendments in extending the look-back period was to protect creditors and the assets of the estate from excessive bonuses, loans, and payouts made to corporate insiders outside the ordinary course of business. 151 Cong. Rec. S1979-01. 2005 WL 497395 at *21-26 (Cong. Rec. Mar. 3, 2005). Congress expressly intended that individuals holding the statutorily enumerated positions should be

subject to higher scrutiny in their dealings with a debtor.  Were the date of receiving payment the date of determining insider status, severance payments such as the one in this case could never be avoided under the statute because insiders would obtain the right to payment but leave the company prior to receipt thus circumventing the purpose of Section 548.

While Thalheimer cites numerous cases[4] from other districts holding that the date of receiving payment is used to determine insider status, these cases are not relevant and involve actual fraud, thus invoking Section 548(a)(1)(A). The Court finds these cases unpersuasive and irrelevant to the issue before it. The *Pittsburgh* and *TransTexas* decisions support the Court's holding that the Employment Agreement is the mark for determining insider status. Thalheimer was both director and CEO of Debtor at the time of the Employment Agreement. Clearly, Thalheimer was at the time a statutory insider pursuant to Sections 101(31) and 548 of the Code.  Because Thalheimer was a statutory insider, it is unnecessary to discuss whether Thalheimer was a non-statutory insider.

**D.     Debtor Received Less Than Reasonably Equivalent Value In Exchange For Thalheimer's Severance Payment**

Courts in the Third Circuit have defined "reasonably equivalent value" as "any benefit . . . whether direct or indirect . . . [which includes any] 'opportunity' to receive an economic benefit in the future." *In re R.M.L.*, 92 F.3d 139, 148 (3d Cir. 1996). To determine whether

---

[4]*Mann v. GTCR Gold Rauner, L.L.C.*, 351 B.R. 708 (D. Ariz. 2006); *Tidwell v. AmSouth Bank, N.A. (In re Cavalier Homes of Georgia, Inc.)*, 102 B.R. 878 (Bankr. M.D. Ga. 1989); *Dent v. Martin (In re Dent)*, 86 B.R. 290 (S.D. Fla. 1988); *Tennessee Whell & Rubber Co. V. Street (In re Tennessee Wheel & Rubber Co.)*, 62 B.R. 1002 (Bankr. M.D. Tenn. 1986); *Williams v. Gordon (In re Camp Rockhill, Inc.)*, 12 B.R. 829 (Bankr. E.D. Pa. 1981).

16

a benefit constitutes "reasonably equivalent value," courts routinely look to the "totality of the circumstances" of the transfer in balancing the following factors: (1) the "fair market value" of the benefit received as a result of the transfer, (2) "the existence of an arm's length relationship between the debtor and the transferee," and (3) the transferee's good faith. *Fruehauf Trailer*, 444 F.3d at 213 (quoting *In re R.M.L.*, 92 F.3d at 148-149, 153).

Thalheimer asserts that the Debtor received reasonably equivalent value because separate counsel represented both Thalheimer and Debtor in arm's length negotiations of the Employment Agreement and the Settlement Agreement. (Thalheimer Brief at 14). Thalheimer contends that his voluntary resignation from the board of directors and waiver of any future claims against Debtor constitutes reasonably equivalent value. (Thalheimer Brief at 14). Thalheimer goes further to argue that the payment of his severance satisfies an antecedent debt which also constitutes reasonably equivalent value. (Reply Thalheimer Brief at 4-5). Lastly, Thalheimer argues that the Debtor cannot avoid the underlying obligation to pay his severance because the underlying obligation became due upon the signing of the Employment Agreement. (Thalheimer Brief at 15).

In the Motion, the Debtor posits that it did not receive any value in exchange for making the severance payment. (Adversary Docket No. 12 referred to as "Debtor Brief at 17). To support its argument, Debtor cites *In re Collegeville/Imagineering, L.P.*, Case No. 95-1619, 1999 WL 33220041 (D. Del. Oct. 5, 1999), holding that future consideration is not reasonably equivalent value because it is not "instrumental" in helping the Debtor avoid

17

bankruptcy and therefore Thalheimer's waiver of future claims is insufficient. (Debtor Brief at 14-15). Thalheimer received an $850,000 base salary in exchange for his services as CEO and Debtor claims it received nothing for making the severance payment to Thalheimer. (Debtor Brief at 16). In concluding its argument, Debtor argues that a plain reading of Section 548(a) entitles the Debtor not only to avoid the transfers, but also the underlying obligation in the Employment Agreement to pay Thalheimer's severance. (Debtor Reply Brief at 11). Debtor further argues that the underlying obligation is within the two-year look-back period because the obligation to pay Thalheimer's severance did not rise until his termination. (Debtor Reply Brief at 6-7). The Court is satisfied that the undisputed material facts require the Court to conclude that the Debtor did not receive reasonably equivalent value.

The Court finds from the undisputed facts that the Debtor did not receive "reasonably equivalent value." At the time Thalheimer signed the Employment Agreement, Thalheimer's $850,000 base salary served as consideration for his services as CEO. The severance package conferred benefits to Thalheimer, not the Debtor. Most notably, Thalheimer had a pre-existing duty to provide services as CEO to the Debtor.

### 1.    Thalheimer's Pre-Existing Duty To Serve As Debtor's CEO Is Not Consideration

"Courts must look to state contract law principles to determine such issues as whether the non-debtor party to the contract is relieved of its obligations under the contract by the debtor's breach, state contract law is only controlling where the Bankruptcy Code itself does

not establish the rule to be applied." *In re Enron Corp.*, 354 B.R. 652, 659 (S.D.N.Y. 2006). 11 U.S.C.A. § 365.

In this case, Thalheimer had a pre-existing duty to serve as CEO pursuant to the Employment Agreement. The Employment Agreement obligated Thalheimer to provide services as CEO in exchange for legally sufficient consideration—an $850,000 base salary. Although the Employment Agreement contemplated "severance payments" and "SERP benefits," the details of these benefits were not finalized at the time the parties signed the Employment Argument. Under the Settlement Agreement, Thalheimer's waiver and voluntary resignation conferred no benefit and was not "instrumental" to the Debtor's success. In *In re Collegeville/Imagineering, L.P.*, 1999 WL 33220041 (D. Del. Oct. 5, 1999), the court determined that an employee conferred reasonably equivalent value when he waived his then-existing contractual right to a $2 million dollar put option in exchange for payments of approximately $125,000. *Id.* at *8. The employee's waiver was critical to the debtor because it enabled the debtor to secure additional financing that helped keep it out of bankruptcy for the remainder of the year. *Id.* In contrast, Thalheimer's waiver and voluntary resignation as director was not "instrumental" to the Debtor's welfare. At the time of the Settlement Agreement, the Debtor was headed toward bankruptcy. Thalheimer's waiver and voluntary resignation did not harm or help the Debtor with its bankruptcy filing.

In a decision more similar to this case, the court in *In re Simone*, 229 B.R. 329 (Bankr. W.D. Pa. 1999), held that future services not yet performed did not constitute reasonably

equivalent value at the time of the transfer. *Id.* at 336. Thalheimer's waiver of bringing a future claim against Debtor did not provide reasonably equivalent value to Debtor because Thalheimer did not have a claim already filed against Debtor at the time of the transfer.

### 2. Debtor Can Avoid The Underlying Obligation To Pay Thalheimer's Severance Pursuant To The Settlement Agreement

The question remains whether a trustee or debtor is permitted to avoid not only a transfer, but also the underlying obligation. In the *All-Type* decision, the trustee sought to recover health insurance payments made four years prior to the debtor's bankruptcy filing pursuant to Connecticut's state avoidance statutes and Sections 547 and 548 of the Code. *All-Type*, 274 B.R. at 319. The Court found that the trustee could not avoid a four-year-old health insurance obligation due to the "temporal limitations" of the Connecticut fraudulent transfer law. *All-Type*, 274 B.R. at 323.  Similar to the Code, Connecticut law provides that a constructive fraudulent transfer can only be avoided if the claim existed either at the time of the transfer or when the obligation was incurred.  *Id.*  Since the underlying obligation was not avoidable by the Trustee, the payments made during the avoidance time frame represented payments on an antecedent debt, and were therefore made for reasonably equivalent value and could not be avoided. *Id.* at 325. Pivotal to the court's decision, however, was the fact that the trustee did not seek to avoid the incurrence of the underlying obligation, instead seeking to avoid the monthly transfer. In its ruling, the court held that "the underlying analysis would be different had the trustee also sought and obtained an avoidance

20

of the incurring . . . obligation. In that event the [p]ayments could no longer be supported by the value of debt satisfaction since no debt would exist." *All-Type*, 274 B.R. at 324.

*All-Type* is inapposite.  Federal bankruptcy laws rather than state avoidance statutes are applicable.  The Debtor does not seek to avoid Thalheimer's severance pursuant to state avoidance statutes. Congressional intent requires bankruptcy courts to adopt the date for an obligation arising under a settlement agreement because not doing so would undermine the purpose of the 2005 amendment. 151 Cong. Rec. S1979-01, 2005 WL 4977395 at *21-26 (Cong. Rec. Mar. 2005). Unlike *All-Type*, the challenge to the underlying obligation is not time-barred because Debtor's obligation to pay Thalheimer's severance arose on the date of the Settlement Agreement. Unlike the trustee in *All-Type*, the Debtor in this case seeks to avoid both the transfer and the obligation and is within its rights to do so under Section 548. Debtor can avoid the underlying obligation thereby effectively eliminating the debt. Because no debt existed, Debtor's transfer of Thalheimer's severance payment was for less than reasonably equivalent value.

### D.    Thalheimer's Severance Payment Is Not A Transfer Made in The Ordinary Course of Business

The fourth prong under Section 548(a)(1)(B)(ii)(IV), requires a showing that the transfer was not made in the ordinary course of debtor's business. The Court examined the purpose of the ordinary course of business requirement in other contexts and held that its purpose is to leave undisturbed *normal financial relations* between a debtor and its creditors,

even as a company approaches bankruptcy. *In re Montgomery Ward, LLC*, 348 B.R. 662, 673 (Bankr. D. Del. 2006)(quoting 5 *Collier on Bankruptcy* P. 547.04(2)(a)(ii)(B) (Alan N. Resnick & Henry J. Somme reds., 15th ed. Rev.)(emphasis added)). The term "ordinary course of business" protects "recurring, customary credit transactions that are incurred and paid in the ordinary course of business of the debtor and the debtor's transferee." *Id.* (quoting *United States Trustee v. First Jersey Sec., Inc. (In re First Jersey Sec., Inc.)*, 180 F.3d 504, 512 (3d Cir. 1999)). Courts hold that when a debtor transfers funds for the sole benefit of an insider, the transfer is not considered in the ordinary course of business. *In re Nat'l Gas Distrib.*, 346 B.R. 394, 405 (Bankr. E.D.N.C. 2006).

Thalheimer asserts that his severance constitutes payment of an antecedent debt and therefore is a transfer made in the ordinary course of business. (Thalheimer Brief at 21). Thalheimer contends that just because severance payments were not made to any other officers does not mean that the payment is outside of the ordinary course. (Thalheimer Brief at 20-21). Thalheimer cites several cases to support the contention that the "recurring" element is not a critical requirement for a transfer to be made within the ordinary course of business. (Thalheimer Brief at 21).

In responding to Thalheimer's arguments, Debtor convincingly argues that the severance payments are outside of the ordinary course of business because they arose from the Employment Agreement and the Settlement Agreement. (Debtor Brief at 17).   It is readily apparent to the Court that Thalheimer's ouster was an unusual and unique occasion

and there was nothing "ordinary" about it or its aftermath. In fact, Debtor represented to the Court, without challenge, that Thalheimer's severance is neither recurring nor customary because no other officer or director of the Debtor received a severance payment. (Hearing Transcript, D.I. 2023 (Main Case) at 12-13). In response to Thalheimer's contention that the severance serves as payment of an antecedent debt, the Debtor argues that the payment of any antecedent debt is not within the ordinary course of business. (Debtor Reply Brief at 18). Debtor properly observes that were Thalheimer correct, Section 548 would not protect creditors from payments made to insiders. (Debtor Reply Brief at 18-19).

Thalheimer's Settlement Agreement is beyond a fare-thee-well, outside the ordinary course of Debtor's business because the severance payment is neither recurring nor customary. The Settlement Agreement granting the severance payment to Thalheimer was not executed until five years after the Employment Agreement. As Debtor's counsel represented during the March 22, 2010 hearing, no other insider or employee received a severance payment upon termination. The fact that no other director or officer received severance payments proves that Thalheimer's severance payment was anything but recurring or customary. Instead, Thalheimer's severance was a transfer made to an insider at a time when the Debtor suffered from severe financial distress, therefore making the payment extraordinary and avoidable.

## V. CONCLUSION

For the reasons discussed, the Debtor's Motion is GRANTED. Debtor successfully established that the severance payment to Thalheimer was a constructive fraudulent transfer as provided by Section 548(a)(1)(B)(ii)(IV) of the Code. Debtor successfully demonstrated it made a severance payment outside the ordinary course of business within two years of the Petition Date, to an insider, Thalheimer, based upon the Employment Agreement and the Settlement Agreement for which the Debtor received no reasonably equivalent value. In turn, Thalheimer's Motion for Summary Judgment is DENIED. An appropriate order will follow.

Dated: April 28, 2010

KEVIN GROSS, U.S.B.J.

24